Thank you. Good morning, your honors. May it please the court. My name is Linda Martin, and I appear today on behalf of the appellant, Pepsico, Inc. The main issue in this appeal is whether the district court abused its discretion in denying Pepsi's motion for a new trial based on a highly prejudicial and improper closing argument by Mahaska's counsel that ultimately affected the outcome of this case. The case before the district court was a business dispute between sophisticated commercial counterparties asserting competing contract and tortious interference claims. The appellee also had other claims, including state and federal antitrust claims, that had been dismissed years before trial in 2017. Now, I would not have time to address the more than 80 improper statements made by Mahaska's counsel during closing, but I do want to give some context and provide examples, a few of the more egregious examples. Counsel, would you focus on the ones that, did you object to any particular comments? The objections were made to the slides that had been exchanged in a reciprocal exchange the night before. Those essentially were a script and a roadmap to what the script was going to be the next day, and those objections included things that went beyond the record. The trial judge, in overruling our objections, agreed that some stretched the record a bit and perhaps went beyond the record evidence. They included comparisons of relative wealth, an indirect appeal for punitives, and then there were vitriol attacks also made during closing. So, I am highlighting those examples of those types of statements. But were the statements themselves, were the statements themselves objected to during the closing? We did not object during closing, but the closing took place as in minutes after the objections were definitively overruled. In Lloyd v. American Airlines, there were objections made to an expert's testimony about an hour before closing, and that was sufficient. It was held you did not need to then object during closing. In fact, that can bring its own prejudice and also draw further attention to those misstatements when you are forced to object during closing. Here, it was just minutes later, and that has been held to be sufficient to preserve the objections and not have to object again when they're made during closing. So, it is your position that none of these matters are subject to plain error review because the objections were all preserved? Yes, Your Honor. Okay. And so, even the vituperative remarks, which occurred in the closing argument, clearly were not before and hadn't been ruled on anywhere else, you think that's still not subject to plain error review? Well, they did attack, in the slides, Lucy Allen, who was our expert, characterizing her and her testimony. Those were in the slides, and those objections were made. I wasn't improper, actually. I mean, did you talk about that? I'm kind of interested because we always let people be cross-examined based on the fees they charge and based on whether or not they've testified captively for one side or the other. But they went beyond and said that she didn't even know how to do math, that she didn't know what an average was, and she's actually highly trained and very well aware of what averages are and how to do math, so it wasn't just the $950 an hour. But even if there was any question about whether there was a gap in one aspect of the objections that had been made to the closing slides and whether that covered everything, one, in the heat of the moment, one doesn't need to be perfect in one's objections. But also, we would, given the 80-plus statements, and I do want to give you some examples of those, the courts, your honors, are not supposed to look at each specific statement in isolation and whether that specific statement was made. It's the cumulative impact of the prejudice that is a test that's supposed to be looked at. And here, that cumulative weight, that prejudice that was created, was overwhelming in bringing about bias and persuading the jury. There are a few of those examples. Mahaska's counsel opened by saying that Pepsi is a 10,000-pound gorilla and always gets its way. Twice during trial testimony, Pepsi had been called a 10,000-pound gorilla. We had objected both times. Those had both been sustained. Also, in closing, Mahaska's counsel said that finding for Pepsi would put Mahaska and its employees, quote, out of jobs and out of business. And as he said this, he gestured to the courtroom gallery, which was stocked with people, he said, were Mahaska employees and their family members, all wearing Mahaska attire. Mahaska's counsel also took a number from one trial exhibit and incorrectly described what that number referred to by showing it to the jury on a $1 billion customer. We objected to this slide. He went on to incorrectly reference Pepsi's billion-dollar revenue seven times. In doing so, repeatedly compared that number with Mahaska's much smaller revenues. That's never a problem. Where did the billion-dollar figure come from? It was from an exhibit that we had put in evidence for another purpose, not for that slide. So when they took that number out of that slide and used it, it was going beyond what the direct testimony had been and what that had been used for. But it was referring to revenues that came into the entire Pepsi network. So all of the various Pepsi bottlers, including Mahaska. So at Dollar General, how much is rung up in sales at those stores? It was not referring to the revenues that Pepsi itself actually sees from that customer, but for the entire network. When the exhibit was received, did the judge receive it for a limited purpose? No, but cross-examination is not meant to go beyond what the direct examination was. Well, that's true. But once an exhibit is offered and received without limitation, is it not fair game to argue it in the course of your closing argument? It's, Your Honor, we respectfully submit it's not fair game to take a number that's been testified means one thing, and then to say it means another thing, and then to muddle it further and allude that it means something else, and then to go on and use that as a way to compare revenues of two entities. It's never proper to invite a jury to render a verdict based on the competing revenues and relative size and wealth of two parties. Punitive damages have been expressly dismissed. There was zero proper purpose for referencing this, and to do so seven times had absolutely no purpose. Did the closing argument of the other side expressly claim that there was a billion dollars in revenue coming from, pardon me? Yes. They actually, I think, made some multiple references to what that number meant. What was that they were doing, and strategically so, was just trying to put the word billion on the record in the context of Pepsi and its size and its revenues. I don't know if you can complain about that if you put in an exhibit that called Dollar General a billion-dollar customer. You put the word in. But if they expressly argued that it meant something other than what the evidence showed it meant, that's arguably a different matter. That's why I'm asking, did they expressly claim that? They did. They referred to Pepsi's billion-dollar revenues. And that's just incorrect on the testimony of Mr. Short. Mr. Short made clear that was not what that meant, and they were incorrectly referencing what that slide meant and what the testimony was. Now, even though, as I mentioned, Mahaska's claim for punitive damages had been expressly dismissed after the close of evidence because there was no evidence of malice in the record, Mahaska's counsel gave the jury his personal opinion that Pepsi's conduct showed malice. And he said specifically, I've been involved in this case for a long time and cannot understand why Pepsi would rather have Dollar General sell Coke in its stores to accomplish these goals. This shows malice. Counsel also vouched for the credibility of Mahaska's witnesses, calling them honest, consistent, hardworking, true, while a minute later saying Pepsi's witnesses didn't tell you the truth. How is that preserved? That wasn't objected to, I assume. Again, Your Honor, we respectfully submit that under Lloyd v. American, there's not an obligation to object again. But the specific statement you just made about that one didn't seem to come under the other types of statements you say were protected by earlier objections. Well, it is another vituperative attack. And there were some vituperative attacks in the slides that we were objecting to. The court overruled those. So it was clear to us at the moment that the court was allowing this to be done. In fact, you said, I believe it's fair argument to go forward and make these statements. So this wasn't the specific vituperative attack that was objected to when the slides were shown, but it was more of that theme that came along. And again, if it's found that not everything was objected to, it was plain error. I'm sorry, Your Honor. Okay. I'm fine. I was going to ask if you have any case that stands for the proposition that vouching or vituperative attacks that occur after an instructions conference and an objection raised to exhibits that sort of preserves every kind of misstatement or vouching that takes place. Sure. The case is clear that the analysis is not meant to be on every single statement. It was that specific statement objected to. It's meant to be, is there a cumulative prejudice here that completely creates bias, prejudice, confusion for the jury, and therefore results in a trial that is prejudiced against Pepsi in this case. And we do have cases, there's one I'm wanting to point to, as to objecting to slides is enough, and that's Dean V. Searcy, actually Mahaska cited to it, objection to a closing slide was sufficient to preserve the issue for appellate review. That's, again, this circuit. About Pepsi's counterclaims, Mahaska's counsel told the jury they were bogus, fake, made up, a bunch of smoke and mirrors, and they, quote, may have sounded good in Pepsi's New York office, but the Pepsi came here, looked at you, meaning the jury, and said, we can do whatever we want. And counsel finished by telling the jury that, quote, your decision will send a signal. Now, I can point you to a few cases, Gilster, ACF Industries, Wittenberg, from the 10th Circuit, where these kinds of statements, emotionally charged, beyond the record, giving the jury the power and responsibility for correcting injustices, considering punishment and deterrence as an element of compensatory damages, which was all that was here, saying that counsel invented facts, accusing his adversary of using smoke and mirrors, saying defenses and counterclaims were manufactured. As to that, Judge Gorsuch wrote in Wittenberg, when he was on the 10th Circuit, for time out of mind, that had been the basis for a new trial. Referencing a degree of calculated intentional malice. And again, in Wittenberg, the 10th Circuit said, that's sufficiently problematic, even standing alone, to warrant reversal. But here, again, I cannot overstate the cumulative impact of the prejudice here. And under the four-factor test, these were not mere aberrations. This reflected a deliberate strategy. There was no curative instruction, just a standard instruction, and where the degree of prejudice is so great. Was a curative instruction requested? No, but we respectfully submit, we had no obligation to do that. We lodged objections just a few moments before closing, got a definitive ruling under General Motors. When it's definitive, you don't need to continue objecting on the record and preserving each time. The trial court held they were fair argument. Even if Mahaska was stretched in the wrong direction, he was allowing these to be made. The size of the verdict here, only $24,000 for Pepsi on its $10.7 million in counterclaims. And here, the weight of the evidence, at the very least, it was a close call. I have some more points, but in closing, I do want to reserve some time for my rebuttal. We submit that Pepsi's objections to Mahaska's closing sides preserved the issues for appellate review. The district court overruled those objections, and Mahaska has not explained to court in its brief why those rulings were not definitive or why Pepsi was obligated to reassert them just minutes later. And I'll reserve the rest of my time for rebuttal. Thank you, Ms. Martin. Mr. Weaver. Can you hear me? Yes. Yes. Good morning. I'm Tom Weaver, and I represent the Mahaska appellees. In an attempt to support this extraordinary request for a new trial based solely on a claim of improper closing argument, Pepsi mischaracterizes the substance and theme of Mahaska's closing argument, ignores totally Mahaska's evidence, ignores its failure to preserve the majority of the objections that it complains about now, attempts to expand the scope of the objections that it did make, misinterprets Judge Gritzner's motion in Lemonade rulings, and asks this court to reject the trial court's exercise of discretion and analysis in a 54-page order ruling on the post-judgment motions, 18 pages of which carefully review the objections Pepsi did raise in its post-judgment motion, notwithstanding the scope of the trial court's discretion. And as to prejudice, Pepsi asked this court to ignore the fact that the jury awarded a small fraction of the damages that Mahaska requested, ruled against Mahaska on some of its claims, and ruled in favor of Pepsi on one of its claims. Now, Pepsi only made specific objections to specific things about specific slides before oral arguments, closing arguments started. There were no objections made during or after the argument before the case was submitted to the jury, and by failing to object, Pepsi deprived the judges and Mahaska of the opportunity to respond to those objections and make a record. Let me give you one example of that. In their briefs, Pepsi complains about improper packing the gallery with Mahaska employees and references to or directing the jury to the gallery. There was nothing in the record supporting who was in the gallery. There's only one statement in the gallery, and that was on page, transcript page 1907, where the attorney from Mahaska asked, who are you going to believe, and pointed to the plaintiff's excerpt, Lucy Allen, or pointed to the people, the witnesses in the gallery. And if we're going to go outside the record, I can tell you who was in the gallery. It was the witnesses from Mahaska who had testified, as well as a group of representatives of independent bottlers who were there as well. Let's talk about what was arguably preserved for error, the reference to the $1 billion customer. The only reference was to revenues related to Dollar General. Actually, it was a reference to Dollar General as a billion dollar customer. That was Pepsi's own exhibit, exhibit 5423. The exhibit contained a number of other customers showing millions and millions of dollars with regard to those customers. Mahaska didn't refer to any of those. Mahaska didn't refer generally to Pepsi's wealth or revenues. It referred only to the number in the exhibit with regard to the Dollar General sales, the billion dollar customer. And Pepsi responded to that argument. Pepsi responded to it in its closing argument. And also, it's important to note that Pepsi had an opportunity to respond to every single argument Mahaska made. Pepsi went last. They had the counterclaim. They argued after Mahaska's opening argument. They argued after Mahaska's rebuttal argument. It was also that it was not in violation of the motion to eliminate, which prohibited only direct evidence of the differences in wealth and revenue. But not evidence that might infer such status. And that's an addendum to page 236. Also, those references were relevant for two reasons. One, Pepsi had argued that it had to cancel the paragraph 8 payments because it was hurting Pepsi's budget. It was a budget buster for Pepsi. And also, it was hurting other bottlers in other territories in the program. And what that reference showed was that this was a huge business. Dollar General was a huge customer. And there was no threat by the $800,000 that had been paid under paragraph 8 reimbursements to Mahaska. And Mahaska was simply arguing when it was requesting the jury to award up to $45 billion that that was not an overstated damage claim and was consistent with the scope of the being done by Dollar General. With regard to the price squeeze, we deal with it in our brief. I'd just like to highlight that there were multiple references to price squeeze, which is the other objection that they made to the demonstrators. So, this is an arguably preserved objection. We're not arguing that that came too long ago. But the reference to the price testified about throughout the trial. And it was relevant because it went to the heart of the paragraph 8 claim. The reason for the 2003 agreement was to address not only Mahaska's, but concerns expressed by other bottlers that what was happening here was that Pepsi was seeking to control the cost of concentrate, which was the major component. What would other bottlers be relevant to? If I read the complaint, the counterclaim, the answer, I'm not seeing anything in there that says that other bottlers somehow are in this case. Well, there was unobjected testimony and documents in the trial. Well, you can't try by consent parties not before the court. Well, no, Judge. They weren't trying it before the court. The point Pepsi was making, the reason that was relevant, the argument Pepsi was making was this was a unique concern of Mahaska. They were suggesting that this paragraph 8 wasn't driven by the things it was driven by. And it was driven by the concerns that Mahaska testified about. And it was consistent with concerns of other bottlers. It wasn't something unique. It was a problem affecting Mahaska. And Pepsi suggested it was something that Mahaska was testifying to, that was complaining about. It wasn't really a problem. Well, in fact, it was a problem for Mahaska. And it was a problem for everyone else. Would you concede that there were at least some areas that had nothing to do with this case and were improper arguments? I mean, would you concede, for example, that malice has no role in any of the claims that survived and were presented to the jury and discussions of malice were unrelated to the claim? Would you concede, for example, that regionalism and sectionalism is not an appropriate argument? Or are you just going to tell us that every single argument that was made in this case was proper? Yes. With regard to the two that you mentioned, regionalism and sectionalism, there was no improper appeal to regionalism or sectionalism bias. The reference to New York that this may sound good in New York was in response to Mahaska's argument and the testimony that the people in New York making these decisions didn't understand what Mahaska was doing, didn't understand Mahaska's pricing, weren't aware of the 2003 amendment. And in fact, Jill O'Brien testifies in her, she testified that the people in New York, and she said the people in New York didn't understand what the pricing was. So there was no regionalism issue. And I can't, what was the other point that you asked about? Malice. Malice. Malice was a component. Now, if you're talking about malice in terms of punitive damage claim, the court didn't, the court did dismiss out the punitive damage claim. But under the tortious interference claim, as emphasized by Pepsi, Mahaska had to show that the predominant purpose of the conduct by Pepsi was to financially injure or destroy Mahaska. And that was what had to be proven. And that's what malice related to. Malice wasn't a term of art to the lay jurors. That's what all that was being referred to there. And with regard to the punitive damage issue, Pepsi refers to two other things stating that Mahaska somehow acted improperly and that you must hold, you must hold Pepsi responsible. Well, they leave off the rest of that sentence, which is hold Pepsi responsible for the damages caused by the breach of the 2003 agreement. And also send the signal to Pepsi. Well, in the context of this, it sent the signal to Pepsi that they have to live up to their contractual obligations, which was the theme of this case. So that there was no improper, the reference to malice was not improper. The reference, there was no improper reference to regionalism and sexualism. How about the dollar customer issue? Did the closing argument of Mahaska claim that Pepsi received a billion dollars in revenue from Dollar General? It raised the question about John Short, who testified with regard to that. He was a Pepsi employee about whether that was really an accurate characterization of what it was and revenues of Mahaska, as suggested by Pepsi here. Why is the characterization of the record to claim that there was a billion dollars in revenue from Dollar General when the record showed that it was just Dollar General's revenues? But what the document said was, Your Honor, was the document doesn't say, the document says Dollar General is Pepsi's new billion dollar customer. That's what it says. Yes, there was some disagreement during the case about what that meant. Was there evidence that Pepsi received a billion dollars in revenue from Dollar General? Was there evidence of that? Other than that exhibit? No, I don't believe there was, Your Honor. But there was disputed about what that was referring to. What about sending a signal? When is that ever a proper argument? I mean, if there's no damages, there's no reason to punish. There's no reason to send a signal. There's no reason to talk about parties outside the parties before the court. I mean, that seems to me to be an improper argument. When you read the closing argument, you'll see that there is nothing to suggest, nothing to suggest punishment. It's no implied or suggested request for punishment with regard to Pepsi. And if it were, which it wasn't, it was clearly an ineffective one considering that the jury awarded about 5% of the damages that Mahaska requested with regard to the claim. But reading that, there is nothing in that reference that suggests anything other than tell Pepsi that they have to live up to their contractual obligations. With regard to the discussion about statements about witnesses or the credibility of witnesses or those types of things, I'd like to point out a couple of things. One, not only were there no objections made to those arguments, those arguments weren't even included in the post-judgment motion. And the suggestion that those were somehow preserved by the single reference to Lucy Allen's testimony in the slide is not supported by anything. And the, again, in the Lucy Allen thing, which is an objection to the slide, it also wasn't included in the post-judgment motion. But when you read the closing argument, we'll see that a counsel talks substantially about all the evidence that supports his criticism, his questioning the credibility. He talks about what the statements were, the things that they, the witnesses did and didn't do, and why that supports his challenges to their credibility. And also with regard to the slides, the slides themselves are full of references to testimony and exhibits supporting the statements made in those slides. Finally, I'd like to, I'd like to deal with the practical concern that if the attorney for the other side has to object to all the misstatements or improper characterizations of the record or so forth, it disrupts the closing argument and arguably prejudices the attorney who has to make all these objections. Why is that a practical concern with your forfeiture argument? I don't think anything like that suggests no objections whatsoever, but the cases that talk about that, your honor, then you make a record, you move for a mistrial, you raise your objections as soon as the closing argument is over and you ask for the curative instructions for a motion for a mistrial. None of that was done here. The first we hear about most of these objections is in the post-judgment function. So, um, that it's, it's not, Do you think it might be sufficient if the lawyer asked to approach the bench after the argument, counsel just made X, Y, and Z misstatements or improper arguments like a curative instruction, you think that would be sufficient to preserve without objecting in the middle of the argument? I think in some cases that suggested that it can be, there are some cases that talk about the concern you expressed, but no cases hold that you sit silent through everything. And then after you get the transcript, after the case has been decided, after you know, you've lost, you go through and, and look at the, uh, you raise your objections. And with regard to this cumulative effect that, that, uh, um, Pepsi keeps talking about the cumulative effect is, um, that applies when you're evaluating whether there's prejudice, whether there's error, if they have to be erroneous of statements first, the bulk of this is, is, um, is, uh, is, is by playing it. If I could just have 10 seconds to make a final closing. I see that my time is up. The jury didn't reach the verdicts that reached based on improper closing arguments. The jury reached the decision to stay on Pepsi's 10 F claim because they listened to all the evidence and saw that Pepsi was asking to be paid for, paid a fee, even though Mahaska sold, took the order, took all the costs associated with the, um, making the product and delivering the product. Thank you, Mr. Weaver. All right. Thank you. The judgment should be Ms. Martin, your rebuttal. Thank you, your honors. Pepsi did not sit silent. It objected just before minutes before the closing argument was given to the script for that closing argument under both Sanchez, which is eighth circuit and Kinset. We did not need to prejudice ourselves further by objecting during the closing argument. Mahaska's counsel bore the risk of what it was doing. And under Harrison, the Purdy brothers, another eighth circuit case, we did not need to and move by moving for a mistrial. And we sufficiently therefore preserved the right to bring a motion for a new trial. Mahaska did succeed in prejudicing the jury. And we got a glimpse of that when the jury asked during the trial, during deliberations, I'm sorry, quote, if the jury were to find that paragraph eight reimbursement requests were overstated, and that was one of Pepsi's counterclaims, would that be considered an injury to Pepsi? So this shows at minimum, it was a close case under Ventura. That's the standard. It cannot be said that Mahaska's improper statements did not accomplish the purpose that they had set out to accomplish. Here, that was to minimize any damage award that was provided against Pepsi. So the jury very well seems to have been persuaded or could have been persuaded that Pepsi had proven its claims, but awarding the full amount that Pepsi claimed risked putting Mahaska and its billion-dollar company like Pepsi, but a $24,000 verdict, anything more than that, would that be, or even millions of dollars in overstatements, would that be any damage to Pepsi? That was the gist of the question that the jury asked. Under this court's precedence, Silbergleit and Gilster, you do not analyze the prejudicial impact of each of these statements in isolation, which again, is exactly what Mahaska would have your honors do. Rather, it's the cumulative prejudicial impact of the remarks. And here, that cannot be overstated for these reasons, Pepsi requests that its motion for a new trial be granted. Thank you, Ms. Martin. Thank you also, Mr. Weaver. We appreciate both counsel's argument to the court this morning and the briefing, which has been submitted to us for review. We will take the case under advisement.